

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

Nos. 07-18-00043-CR

ANTHONY CARTER, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

On Appeal from the 137th District Court
Lubbock County, Texas
Trial Court No. 2017-413-558, Honorable John J. McClendon, III, Presiding

May 14, 2019

OPINION

Before QUINN, C.J., and PIRTLE and PARKER, JJ.

Anthony Carter (appellant) appeals his conviction for possessing a controlled substance with intent to deliver and his 90-year prison sentence. He operated several smoke shops from which he sold, among other products, an item called "Chilly Willy" which contained the compound fluoro-ADB. Though fluoro-ADB was not expressly named as a controlled substance by Texas statute, several components of it allegedly were within Penalty Group 2-A of § 481.1031(b) of the Texas Health and Safety Code. Four issues pend for our review. After considering each, we affirm.

*Void Indictment*

Though not the first issue mentioned by appellant, we address it first. He contends that the indictment was void because it did not allege an offense. It purportedly failed to allege an offense because, through it, the State accused "Anthony Carter" of "knowingly possess[ing], with intent to deliver, 'Chilly Willy; 2g Chronic Hypnotic' which contains a compound controlled in Penalty Group 2-A, Chapter 481.1031(b)(5) of the Texas Health and Safety Code, to wit: fluoro-ADB, by aggregate weight including adulterants and dilutants 400 grams or more." As previously mentioned, fluoro-ADB was not expressly named as a controlled substance in that statutory provision. Because it was not, appellant believed the indictment failed to vest the trial court with subject-matter jurisdiction, which rendered the conviction void. We overrule the issue.

The sufficiency of an indictment is a question of law. *State v. Zuniga*, 512 S.W.3d 902, 906 (Tex. Crim. App. 2017). Additionally, whether a charging instrument is sufficient and avers an offense depends on whether the statements therein "are clear enough that one can identify the offense alleged." *Teal v. State*, 230 S.W.3d 172, 180 (Tex. Crim. App. 2007). In other words, we must assess if "the trial court (and appellate courts who gives deference to the trial court's assessment) and the defendant [can] identify what penal code provision is alleged and [whether] that . . . provision [is] one that vests jurisdiction in the trial court." *Id.* If the answer is yes, then the indictment is sufficient to vest the trial court with subject-matter jurisdiction. *Id.* If not, then the conviction is void for want of jurisdiction.

Here, the indictment identified 1) the name of the accused and 2) the crime or offense of which he was accused. The former was "Anthony Carter," our appellant. The latter was "knowingly possess[ing]" 400 or more grams of a "compound controlled in

2

Penalty Group 2-A [of] Chapter 481.1031(b)(5) of the Texas Health and Safety Code." Furthermore, possessing a controlled substance within that penalty group in a quantity having an aggregate weight of 400 or more grams was and is a felony. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.1161(b)(3) (West 2017) (stating that the offense is a state jail felony if the amount is, by aggregate weight, including adulterants and dilutants, five pounds or less but more than four ounces).[1] Appellant being identified as the accused and being told of the criminal statute he violated satisfied the requirements of *Zuniga*. So, the indictment was sufficient to vest the district court with subject-matter jurisdiction over the proceeding. *See Kirkpatrick v. State*, 279 S.W.3d 324, 329 (Tex. Crim. App. 2009) (finding that the indictment sufficiently alleged an offense within the district court's jurisdiction because it was returned in a felony court and on its face disclosed the name of the offense and the penal code provision assigned it). And, that the indictment failed to mention the particular compound or chemical within the litany of compounds and chemicals itemized within § 481.1031(b)(5) does not alter our decision.

Penalty Group 2-A encompasses "materials, compounds, mixtures, or preparations" containing certain specified natural or synthetic chemical substances listed within § 481.1031(b). *See* TEX. HEALTH & SAFETY CODE ANN. § 481.1031(b)(1)–(8) (West Supp. 2018) (naming the natural or synthetic chemical substances comprising the materials, compounds, mixtures, or preparations). If appellant were confused about or questioned whether "fluoro-ADB" or the chemicals comprising it fell within the category of prohibited materials, compounds, mixtures, or preparations, he could and should have objected to the indictment before trial. *See Kirkpatrick*, 279 S.W.3d at 329 (stating that

---

[1] Funny that the statute defines the weight in terms of ounces and pounds (i.e., the American way of measuring weight) while the indictment refers to grams. That is inconsequential, though, given the ability to convert grams into ounces, and 400 or more grams equals 14 or more ounces.

"if [Kirkpatrick] had confusion about whether the State did, or intended to, charge her with a felony, she could have, and should have, objected to the defective indictment before the date of trial"). Because appellant did not do so, he waived his complaint. *See Herrera v. State*, No. 06-18-00111-CR, 2019 Tex. App. LEXIS 3018, at *2–3 (Tex. App.—Texarkana Apr. 15, 2019, no pet. h.) (mem. op., not designated for publication) (so holding when addressing a similar contention also involving fluoro-ADB).

*Sufficiency of the Evidence*

Next, appellant questions the sufficiency of the evidence underlying his conviction. His attack is directed at whether the State proved 1) he knowingly sold a controlled substance listed in § 481.1031(b)(5) and 2) the substance he was convicted of possessing fell within that provision. We overrule both issues.

The pertinent standard of review is explained in *Johnson v. State*, 560 S.W.3d 224, 226 (Tex. Crim. App. 2018). We refer the parties to that opinion and forgo reiterating the standard here.

Again, the controlled substance appellant allegedly possessed fell within § 481.1031(b)(5) of Penalty Group 2-A of the Texas Health and Safety Code. Per § 481.113 of the same Code, a person commits an offense if he "knowingly manufactures, delivers, or possesses with intent to deliver a controlled substance listed in . . . Penalty Group . . . 2-A." Tex. Health & Safety Code Ann. § 481.113(a) (West 2017). Therefore, securing a conviction under that statute obligated the State to prove not only that the substance in question was within § 481.1031(b)(5) but also that the accused (appellant) knew it was a substance within that provision. *See White v. State,* 509 S.W.3d 307, 309 (Tex. Crim. App. 2017) (involving a Penalty Group 1 controlled substance and stating that "[t]his is a nature-of-conduct offense, and the statute expressly assigns culpable mental

4

states to the nature of the conduct: A defendant must be aware that he is delivering a Penalty Group 1 substance to be guilty"); *Blackman v. State*, 350 S.W.3d 588, 594 (Tex. Crim. App. 2011) (stating that to prove "the unlawful-possession-of-a-controlled-substance element of the charged offense in this case, the State was required to prove that: 1) appellant exercised control, management, or care over the three kilograms of cocaine; and 2) appellant knew that this was cocaine"). We first address if the State proved that the item possessed by appellant was a controlled substance under § 481.1031(b)(5).

*Proof Chilly Willy Was a Controlled Substance*

Penalty Group 2-A described in § 481.1031 encapsulates materials, compounds, mixtures, and the like containing any quantity of natural or synthetic chemical substances "listed by name in this subsection or contained within one of the structural classes defined in this subsection." TEX. HEALTH & SAFETY CODE ANN. § 481.1031(b). Subparagraph (5) of (b) describes one such "structural class" as "any compound containing a core component substituted at the 1-position to any extent, and substituted at the 3-position with a link component attached to a group A component."[2] *Id.* § 481.1031(b). While neither "Chilly Willy" nor "fluoro-ADB" were alluded to in § 481.1031(b)(5), the State's expert nonetheless described fluoro-ADB as having various ingredients within its category of core, link, and group A components. That is, the core component found in "fluoro-ADB" was "indazole," according to the forensic chemist, while its link and group A components

---

[2] The terms "core component," "group A component," and "link component" were and are defined through a litany of various chemicals. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.1031(a)(1)–(3) (specifying the respective chemicals within each component).

were "carboxamide" and "methoxy dimethyl oxobutane," respectively.[3]  These chemicals were found per "gas chromatography mass spectrometry," he continued.  The prosecutor asked the forensic chemist, "So if we put all of those together . . . .  We see the portions of fluoro-ADB that are relevant to this; is that correct?"  The chemist answered, "Correct. . . .  [B]ased off of those three combinations, that's why it is able to be controlled under the structural class with how the law is currently written."  Sadly, the chemist was not asked to clarify the latter statement.  This is of import because § 481.1031(b)(5) speaks in terms of certain chemicals having a specific placement within the molecular structure of an illegal compound.

That is, criminal statutes outside the Penal Code must be strictly construed.  *State v.* Cortez, 543 S.W.3d 198, 206 (Tex. Crim. App. 2018).  Being within the Health and Safety Code, § 481.1031(b)(5) is one such statute outside the Penal Code necessitating strict construction.  Per its terms, a compound within its scope is one "containing a core component, [i.e., indazole], substituted **at the 1-position** to any extent, and substituted **at the 3-position** with a link component [i.e., carboxamide] **attached to** a group A component [i.e., methoxy dimethyl oxobutane]."  (Emphasis added).  If one is to heed the actual wording of (b)(5), it is not enough that the chemicals are found in a compound. That is, guilt requires more than merely utilizing a bygone means of ordering from a Chinese menu, *i.e.*, one item from column A and two from column B.[4]  Simply pulling "indazole" from the core component column, "methoxy dimethyl oxobutane" from the

---

[3] "Indazole" is named within the statutory category of "core component," *id.* § 481.1031(a)(1), while "carboxamide" is listed as a "link component," *id.* § 481.1031(a)(3), and "methoxy dimethyl oxobutane" as a "group A component."  *Id.* § 481.1031(a)(2).

[4] Barry Popik, "*One from column A, one from column B" (Chinese menu ordering)*, THE BIG APPLE (Dec. 20, 2007) https://www.barrypopik.com/index.php/new_york_city/entry/one_from_column_a_one from_column_b_chinese_menu_ordering (discussing the origins of what became known as the "Chinese menu" system).

group A column, and "carboxamide" from the link column gets the State nowhere. Instead, each item must be located on the plate in a certain way for the ultimate "meal" to be 非法 (i.e., illegal). To conclude otherwise would be to ignore the legislature's wording, and that we cannot do. So, construing the statute strictly leads us to hold that the State must prove the respective components or chemicals were located or attached as expressed in the statute.

Neither the forensic chemist nor any other witness expressly said that the pivotal compounds in "fluoro-ADB" were in the "positions" or "attached" as directed by § 481.1031(b)(5). Instead, the expert opined that "based off of those three combinations, that's why [fluoro-ADB] is able to be controlled under the structural class with how the law is currently written." Whether this was his way of confirming that the chemicals indazole, carboxamide, and methoxy dimethyl oxobutane had the requisite placement or attachments is a bit unclear. Nonetheless, the standard of review obligates us to look at all the evidence and construe it in the light most favorable to the verdict or prosecution. *See Johnson*, 560 S.W.3d at 226. In abiding by that standard, we encounter where, prior to voicing his opinion, the expert described how the legislature had recently changed the law in attempting to criminalize synthetic marijuana. While doing so, he uttered several informative statements. They were as follows: 1) "[O]ne of the recent additions to the law is instead of listing each substance by name, we now actually classify a synthetic compound *by the structure*"; 2) "[T]here are a whole bunch of different *combinations of structures*, and depending on what kinds of groups *create that molecule*, it's classified by different subsections in the law"; 3) Fluoro-ADB fell within structural class § 481.1031(b)(5); 4) "From a chemist's perspective, really, and as a forensic chemist, we're looking at *how the structure relates* to the law"; 5) "[S]o we are looking at different

7

parts of the compound to see if it falls within that particular subsection" of the statute; 6) "[S]ince we are *looking at the structural class*, now we are actually looking at the structure itself and seeing if that falls *within a particular combination* of groups"; 7) "I do know *structurally* [fluoro-ADB] is under the 2-A"; 8) The law "classifies three different parts *of the molecule*"; 8) from "a forensic aspect, I can at least tell you that [fluoro-ADB is] the indazole ring group, and then also I have tried to make it easier on all of us by showing how the indazole actually *fits in with the structure*"; and 9) "[B]ased off of those three combinations [of indazole, methoxy dimethyl oxobutane, and carboxamide], that's why it is able to be controlled under the structural class with how *the law is currently written*." (Emphasis added). To that we add his answer of "Correct" when asked, "And that's what makes a compound, the place where *the molecules are stuck*, correct?" and his statement that "but it's where the fluorine is actually attached to a particular carbon" when asked whether a different form of fluoro-ADB would be a controlled substance under § 481.1031(b)(5). (Emphasis added).

Finally, the tenor of the defense counsel's own argument and questions shed some light. During his cross-examination of the expert, he was attempting to point out that lay people would be unable to know if a compound he had was controlled under § 481.1031(b)(5). In doing so, he uttered, "Well, if I don't know that I'm charged with 5-fluoro ADB-PINACA, I can't go and look and see in the statute and go, 'Wait a minute, that NH2 component,' and I guess it's *the first position*, or whatever . . . ." (Emphasis added). Admittedly, his comments were and are not competent evidence. Yet, they, along with the expert's testimony we cited, illustrate context. That context describes ongoing discussion about molecular structures of compounds within § 481.1031(b)(5) and the positioning of particular chemicals within that structure. In the expert so

8

describing about molecules, structural classes, structures, the structural class described in § 481.1031(b)(5), and the core, link, and group A components of fluoro-ADB, a rational fact-finder could reasonably interpret his ultimate opinion about why fluoro-ADB "is able to be controlled under the structural class with how the law is currently written" as meaning the core, link, and group A components at bar were in the positions and had the attachments required by § 481.1031(b)(5).

Simply put, we reached the end despite the length of the route taken and the fog covering its path. The State presented sufficient evidence to permit the jury to rationally conclude, beyond reasonable doubt, that fluoro-ADB was a controlled substance within the scope of § 481.103(b)(5).

*Proof of Mens Rea*

Next, we turn to the sufficiency of the evidence purporting to establish that appellant knowingly sold the substance controlled under § 481.1031(b)(5). In questioning the tenor of the State's proof here, appellant alludes to the United States Supreme Court opinion in *McFadden v. United States*, __ U.S.__, 135 S. Ct. 2298, 192 L. Ed. 2d 260 (2015), and its discussion of how to prove culpability under a comparable federal statute. The court observed that the "knowledge requirement" may be satisfied in either of two ways. *McFadden*, 135 S. Ct. at 2304. The prosecutor may show "the defendant" 1) knew "he possessed a substance listed on the schedules, even if he did not know which substance it was" or 2) knew "the identity of the substance he possessed." *Id.* An example of the former would include, according to the Court, "a defendant whose role in a larger drug organization is to distribute a white powder to customers. The defendant may know that the white powder is listed on the schedules even if he does not know precisely what substance it is." *Id.* We apply this mode here, at appellant's invitation.

9

The seizure culminating in appellant's prosecution occurred around May 1, 2017. About four months earlier, in January of 2017, law enforcement officers had executed a search warrant upon one of appellant's stores. Packets being sold there and having names such as "Chilly Willy," "Ripped," "Mary Jane," and "Brain Freeze" were confiscated. More importantly, an officer assisting in the search and seizure informed appellant at that time that "the synthetic that he was selling was illegal to sell." Yet, he continued to sell them over the ensuing months.

Additionally, on the face of some packets were images depicting what one could interpret as the potential effects of ingesting their contents. For instance, the "Chilly Willy" packet carried a person with long hair, sunglasses, and medallions sitting crossed-legged, with two fingers up in the form of a peace sign and smoking a self-rolled cigarette.[5] The

---

[5]



    

words "chronic hypnotic" could be read next to the sitting gentleman. Much like a picture painting 1000 words, the visage could be viewed as suggesting that one who consumed the product would be "chilled-out" in a manner purportedly resulting from smoking marijuana.

Another packet, "Ripped," had an image of a banana with legs, hands, face, a wide-opened, smiling mouth, and bulging eyes.[6] Those eyes just happened to be bloodshot. So too were the banana's hands raised upward. Viewing the depiction as a whole evinces an object engaged in a highly animated state of being. And, of course, there was the packet labelled "Mary Jane." The Spanish translation for that name happened to be "Maria Juana" or, in its abbreviated version, "marijuana."[7]

---

[6]







[7] Along with these packets, the officers also found actual marijuana.

11

In short, appellant was told of the illegal nature of the substances. Furthermore, those substances were packaged in a way that suggested their purposes and effects. That data was more than some evidence allowing a rational jury to conclude, beyond reasonable doubt, that appellant knew "Chilly Willy" was a synthetic substance the legislature intended to outlaw under Penalty Group 2-A. He may not have known the specific compounds it contained and which were within Penalty Group 2-A, but per *McFadden*, that knowledge is unnecessary. The evidence was enough to prove he possessed a substance listed on the schedules, even if he did not know which substance it was. We overrule appellant's issue.

*Expert Witness*

Next, we address appellant's issue regarding whether the trial court erred in allowing the State's forensic chemist to testify about the fluoro-ADB being a controlled substance. Allegedly, he "was not qualified to testify about synthetic substances" since he "had virtually no formal education, experience, or training on synthetic substances." So, allegedly, the "trial court abused its discretion when it certified him as an expert." We overrule the issue.

A trial court's decision concerning whether a witness is qualified to voice an expert opinion is reviewed under the standard of abused discretion. *Wolfe v. State*, 509 S.W.3d 325, 335 (Tex. Crim. App. 2017). That standard bars us from interfering with the decision if it falls within the zone of reasonable disagreement. *Id.*

Next, qualifying a witness as an expert normally implicates a two-step procedure. *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006). First, it must be shown that the witness has a sufficient background in a particular field, which background encompasses the matter on which the witness is to give an opinion. *Id.* (quoting *Broders*

12

*v. Heise,* 924 S.W.2d 148 (Tex. 1996)). The second step gauges the relationship between the subject matter at issue and the expert's familiarity with it; that is, it must be shown that the expert's background is "tailored to the specific area of expertise in which the expert desires to testify." *Id.* at 133.

Here, appellant attacked the expert's qualification due to a lack of "formal academic instruction, on-the-job training, or experience with synthetic substances" and the witness's unfamiliarity with how to "create" or make the fluoro-ADB or other synthetic controlled substances. Yet, the topic on which the chemist was asked to speak was not how those who engaged in the drug trade made their drugs. How synthetic drugs were made actually had little to do with the burden being addressed by the State. Indeed, the manner by which appellant attempts to attack the expert brings to mind a scene from "The Big Bang Theory."

Leonard's car is about to break down. He asks his highly educated scientist friends riding with him if "anybody [knew] anything about the internal combustion engine." Having doctorates in physics and astrophysics or master's in engineering, they responded with, "Of course," "Very basic," and "[It's] 19th-century technology." When asked whether "anybody [knew] how to *fix* an internal combustion engine," the replies were "No" and "No, not a clue."[8] The relevant topic there was how to fix a car engine, not the physics behind or design of an internal combustion engine.

Here, we do not deal with a car motor but, rather, § 481.1031(b)(5). To meet its requirements, the State was obligated to prove that the synthetic drug in question consisted of certain chemicals and those chemicals held certain molecular positions

_____

[8] *The Big Bang Theory - Combustion Engine*, YOUTUBE, https://youtu.be/i9en6AcVkBo (last visited May 7, 2019).

13

within the compound they composed. In other words, the pertinent subject matter concerned the molecular structure of the synthetic, the chemicals comprising that structure, and their locations within the molecule in relation to each other. So, whether the witness knew how to make the drug in question was really unimportant. Instead, the witness had to be skilled or trained in the fields of identifying the chemical composition of substances and the molecular structures of the chemicals identified therein. The witness utilized by the State to do that had a bachelor's degree in forensic chemistry and criminalistics, a master's degree in forensic science, and four months of intensive training with the Department of Public Safety in "controlled substance analysis." In short, he was a forensic chemist who conducted controlled substance and blood alcohol analysis. As such, one of his primary duties was "tak[ing] unknown substances and figur[ing] out what they [were]," that is, identifying the chemical composition of substances. He apparently worked in that field with the Department of Public Safety for about four years and testified on the topics of blood and controlled substance analysis about 20 times. So too had he conducted "thousands of testing[s] for all sorts of different drugs." Whether the substances undergoing analysis were synthetically created mattered little because the manner in which they were tested differed little from the analysis of non-synthetic controlled substances. As he testified, "it's just like any other drug": "[W]hen it comes to detecting a drug, it's the same whether it's meth, cocaine, heroin, any other drug." More importantly, appellant has cited us to nothing that suggests the analysis is different.

Just as Leonard may have needed someone who knew how to take apart and fix a carburetor, the State needed someone who could take apart a drug and determine its chemical composition, irrespective of whether the drug was naturally occurring or cooked up by a human being. And, the foregoing evidence about the education, training, and

14

experience of the forensic chemist under attack illustrated that he had the requisite capability to undertake the job assigned him. At the very least, the trial court's determination that he had such training and skill in the relevant topic was not outside the zone of reasonable disagreement.

*Excessive Sentence*

Through his final issue, appellant asserts that "[s]entencing [him] to ninety years in prison for this offense [was] excessive, cruel, and unusual, in violation of the Eighth Amendment of the United States Constitution." As we recently reiterated in *Anderson v. State*, No. 07-17-00421-CR, 2019 Tex. App. LEXIS 2261, at *10 (Tex. App.—Amarillo Mar. 22, 2019, pet. filed) (mem. op., not designated for publication), a complaint about punishment being excessive or cruel and unusual must be preserved for review. That is normally done by a defendant complaining of the sentence when pronounced at trial or, if there was no opportunity to object, complaining through a motion for new trial. *Id.* at *10–11. The record before us discloses that appellant did neither. Consequently, whether his sentence was unconstitutionally excessive or cruel and unusual was not preserved for review, and the issue is overruled.

We affirm the trial court's judgment. So too do we deny, as moot, appellant's motion to strike from the appellate record a molecular diagram of fluoro-ADB used as demonstrative evidence at trial; whether it could or could not be considered in assessing the sufficiency of the evidence was a matter that we found irrelevant to the disposition of the appeal.

Brian Quinn
Chief Justice

Publish.

15