

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. PD-0575-19

---

**ANTHONY CARTER, Appellant**

**v.**

**THE STATE OF TEXAS**

---

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE SEVENTH COURT OF APPEALS
### LUBBOCK COUNTY

---

**YEARY, J., delivered the unanimous opinion of the Court.**

### O P I N I O N

In November of 2017, a jury found Anthony Carter, Appellant, guilty of possession of a Penalty Group 2-A controlled substance, with intent to deliver. He was subsequently sentenced to 90 years in prison and received a $100,000 fine. The Seventh Court of Appeals affirmed his conviction. *Carter v. State*, 575 S.W.3d 892 (Tex. App.—Amarillo 2019). We granted Appellant's petition for discretionary review to determine whether, in a legal sufficiency analysis, a reviewing court may uphold a conviction if expert testimony as to

certain technical elements of an offense is merely conclusory. Having concluded that the testimony in this case is not merely conclusory, we affirm.

## THE STATUTE

Under Section 481.113 of the Texas Health and Safety Code, a person commits an offense if he "knowingly manufactures, delivers, or possesses with intent to deliver a controlled substance listed in Penalty Group 2 or 2-A." TEX. HEALTH & SAFETY CODE § 481.113(a). That part of the statute is simple enough to understand. But Section 481.1031(b), the part of the Health and Safety Code describing Penalty Group 2-A gets a bit more scientifically esoteric. It was first promulgated in 2011 to address synthetic substances, and such substances were originally identified specifically by name. *See* Acts 2011, 82nd Leg., ch. 170, eff. Sept. 1, 2011 (enacting TEX. HEALTH & SAFETY CODE § 481.1031). But in 2015, the Legislature amended Section 481.1031, so that it now defines synthetic controlled substances by structural class. *See* TEX. HEALTH & SAFETY CODE § 481.1031(b). It appears that one of the reasons for the adoption of the amendment was that under the pre-amendment language, "a skilled chemist may [have] be[en] able to change the chemical makeup of a substance enough to circumvent the law and make the law difficult to enforce."[1] S. Comm. on Crim. Justice, Bill Analysis, Tex. S.B. 173, 84th Leg., R.S. (2015).

Accordingly, Penalty Group 2-A, as now defined in Section 481.1031(b), focuses on the positioning of certain molecular components to determine whether the synthetic

---

[1] The jury in Appellant's case heard testimony from the State's expert about the 2015 amendment and the different way in which the amended statute defined prohibited synthetic substances.

compound is prohibited. For example, Subparagraph (5) of Section 481.1031(b), which is at issue in this case, describes a "structural class" as "any compound containing a core component substituted at the 1-position to any extent, and substituted at the 3-position with a link component attached to a group A component, whether or not the core component or group A component are further substituted to any extent[.]" TEX. HEALTH & SAFETY CODE § 481.1031(b)(5).[2]

## THE STANDARD

When reviewing the legal sufficiency of the evidence, an appellate court must view the evidence in the light most favorable to the prosecution and ask whether any rational trier of fact could have found each element of the offense beyond a reasonable doubt. *Johnson v. State*, 560 S.W.3d 224, 226 (Tex. Crim. App. 2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The appellate court must give deference to "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to

---

[2] The relevant portions of the statute are as follows:

> (b) Penalty Group 2-A consists of any material, compound, mixture, or preparation that contains any quantity of a natural or synthetic chemical substance, including its salts, isomers, and salts of isomers, listed by name in this subsection or contained within one of the structural classes defined in this subsection:
>
> * * *
>
> (5) any compound containing a core component substituted at the 1-position to any extent, and substituted at the 3-position with a link component attached to a group A component, whether or not the core component or group A component are further substituted to any extent, including . . .

TEX. HEALTH & SAFETY CODE § 481.1031(b)(5).

draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Circumstantial evidence and direct evidence are equally probative, and either one alone can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Juries are permitted to draw reasonable inferences from the evidence presented at trial "as long as each inference is supported by the evidence presented at trial." *Id*. at 15. Further, "criminal statutes outside the penal code must be construed strictly, with any doubt resolved in favor of the accused." *State v. Johnson*, 219 S.W.3d 386, 388 (Tex. Crim. App. 2007). Thus, for the court of appeals to have properly affirmed Appellant's conviction, there must have been sufficient evidence presented by the State that the molecular components within the compound were positioned as described in Section 481.1031(b)(5). The court of appeals concluded that there was, and we agree.

## FACTS AND PROCEDURAL POSTURE

The facts are undisputed. Appellant operated a handful of smoke shops located in Lubbock county. He sold various products, including a leafy substance called "Chilly Willy." In 2014, Appellant received a letter from the Lubbock County District Attorney warning him against the continued sale of synthetic marijuana. After receiving the letter, Appellant sent samples of his products, including Chilly Willy, to a lab for testing. At that time, the Chilly Willy was not tested for fluoro-ADB. However, later testing by the State determined that Chilly Willy did, in fact, contain fluoro-ADB.

Some two years after the 2015 amendment to Section 481.1031(b), the Lubbock Police Department executed a search warrant (one of several executed between 2014 and 2017) at Appellant's residence. The police found multiple boxes containing individually

packaged bags of Chilly Willy. Appellant was charged by indictment with "knowingly possess[ing], with intent to deliver, 'Chilly Willy; 2g Chronic Hypnotic' which contains a compound controlled in Penalty Group 2-A, Chapter 481.1031(b)(5) of the Texas Health and Safety Code, to wit: fluoro-ADB, by aggregate weight including adulterants and dilutants 400 grams or more."

At trial, the State presented expert testimony from John Keinath, a controlled substance analyst with the Texas Department of Public Safety (DPS) Crime Laboratory in Lubbock. Keinath testified that he had been a forensic chemist in the DPS crime lab in Lubbock for four years. His expertise included controlled substance and blood analysis. He testified that he obtained a Bachelor of Science degree in Forensic Chemistry from Lake Superior State University in Michigan and a Master of Science degree in Forensic Science from the University of Illinois at Chicago. He testified that he has had an additional four months of "intensive" training in analysis of controlled substances through DPS and that he is a member of the American Academy of Forensic Sciences. He claimed to have testified about twenty times in court about controlled substance or blood analysis.

Keinath began his testimony with a discussion of Section 481.1031(b) before it was amended and the effect of the 2015 amendments. Specifically, Keinath told the jury: "[I]nstead of listing each substance by name, we now actually classify a synthetic compound by the structure. So there are a whole bunch of different combinations of structures, and depending on what kinds of groups create that molecule, it's classified by different subsections in the law." Keinath went on to testify about the lab's method of testing and how he tested the Chilly Willy substance. He went into painstaking detail about

the method of testing that he used, and in response to the prosecutor's question of what synthetic compound was contained in the Chilly Willy products, Keinath said, "So – again, based off of the 12 [samples] that I tested, the substance contained was fluoro-ADB."

Further, Keinath went on to describe the "three parts" needed to determine whether the substance falls within Penalty Group 2-A. To help illustrate his point, the State used a demonstrative exhibit that depicted fluoro-ADB. We have reproduced that exhibit here:



Keinath explained the following:

> So how the law is written, we're looking at what's called a core component, a group A component, and a link component. Up there on the screen, those are all the core components that could possibly create a particular substance; likewise, with a group A and link components. Now, with any synthetic compound, you can take any of those core components, group A components, and link components, and make quite a few different structures. But by doing so, it changes what the structure is called or what it is named.

He went on to explain that fluoro-ADB contains various prohibited components in the core component, group A component, and the link component.[3] Specifically, he testified that the core component of fluoro-ADB was indazole, the group A component contained methoxy dimethyl oxobutane, and the link component contained carboxamide. The prosecutor then asked Keinath, "So if we put all of those together, then that's what we see here. We see the portions of fluoro-ADB that are relevant to this; is that correct?" To which Keinath responded, "Correct. Based off of those three combinations, that's why [fluoro-ADB] is able to be controlled under the structural class with how the law is currently written."

Also, defense counsel's own line of questioning on cross-examination helped shed some light for the jury. Counsel for the defense asked Keinath: "[Y]'all spent a lot of time, [the prosecutor] and you, on how the chemical compounds work with the placement of the . . . molecules [and] where the molecules are. And that's what makes a compound, the place where the molecules are stuck, correct?" To which Keinath responded: "Correct." As cross-

---

[3] Section 481.1031(a), subsections (1) through (3), identify, by name, the components that are prohibited in the "Core component," "Group A component" and "Link component." As relevant in this case, they are:

(a) In this section:

(1) "Core component" is one of the following: . . ., indazole[.]

(2) "Group A component" is one of the following: . . ., methoxy dimethyl oxobutane[.]

(3) "Link component" is one of the following functional groups: carboxamide[.]

TEX. HEALTH & SAFETY CODE § 481.1031(a)(1)–(3).

examination continued, defense counsel asked Keinath whether fluoro-ADB is actually listed in the statute, and Keinath responded that it is not, but that it is a synthetic compound. Keinath went on to explain: "[B]ased off my knowledge, there might be different isomers, but as far as the core, the group A, and the link, fluoro-ADB is that particular part of it."

Finally, defense counsel spent some time discussing with Keinath types of chemicals that also have fluoro-ADB in the name of the chemical. During this colloquy, the following exchange occurred:

> Q: And what is 5 fluoro-ADB metabolite 7?
>
> A: Just based off of the name, all I can really say or infer is that it might have something to do with the toxicology of it, so after it's been processed through the system. But I personally don't know what the "ADB metabolite 7" is.
>
> Q: Do you know if that particular chemical structure is in the Penal Code?
>
> A: Based off of the structure provided on this particular product insert, it appears to be the same structure as the 5-fluoro-ADB.
>
> Q: Okay. What about 2-fluoro-ADB? Are you certain that's in the Penal Code?
>
> A: The 2-fluoro-ADB would be in the Penal Code, because again, based off of the Penal Code, we are looking at the core, the group A, and the link. It doesn't matter where the fluorine falls because the law broadly says that if it's a natural or synthetic compound, it includes any isomers, or stereoisomers, any of those. So under the broadness of the Penalty Group 2-A law, any sort of isomer would be covered.

During his testimony Keinath never explicitly described the specific *placement* of the components within the synthetic compound, fluoro-ADB, that Appellant was alleged to have possessed in the form of Chilly Willy. Nor did the State present any other evidence

specifically indicating that indazole (the core component) was substituted at the 1- position to any extent, and substituted at the 3- position with carboxamide (the link component) attached to methoxy dimethyl oxobutane (the group A component)—as Section 481.1031(b)(5) requires to establish the existence of a synthetic compound.

Appellant contended on direct appeal that, because the State produced no explicit testimony regarding the exact positioning of the components within fluoro-ABD, the court of appeals erred in finding that the evidence was legally sufficient. He argued that an ordinary jury could not have taken Keinath's testimony about the mere presence of the components of the compound fluoro-ABD and inferred from that testimony that fluoro-ADB satisfied the requisite structural requirements as set out in Section 481.1031(b)(5). Accordingly, he argued that the State failed to prove that: "1) he knowingly sold a controlled substance listed in [Section] 481.1031(b)(5)[,] and 2) the substance he was convicted of possessing fell within that provision." *Carter*, 575 S.W.3d at 896. The court of appeals disagreed and affirmed Appellant's conviction, concluding that "[t]he State presented sufficient evidence to permit the jury to rationally conclude, beyond reasonable doubt, that fluoro-ADB was a controlled substance within the scope of [Section] 481.103(b)(5)." *Id.* at 899.

## ANALYSIS

We conclude that, when looking at *all* of Keinath's testimony, a rational trier of fact could reasonably infer that his analysis established that fluoro-ADB satisfied the criteria of Section 481.1031(b)(5): that indazole (the core component) was substituted at the 1-position to any extent, and substituted at the 3-position with carboxamide (the link

component) attached to methoxy dimethyl oxobutane (the group A component)—even though he did not explicitly say so.

At first glance, it seems irrational to expect an ordinary factfinder to make an inference regarding positioning of certain components in a synthetic compound. But, the mere fact that an ordinary factfinder, prior to any evidence being presented, could not make the required inferential step, does not mean that an informed factfinder could not reasonably make such an inference. That is all to say that an ordinary jury could still draw a reasonable inference from an expert's testimony about technical elements as long as each inference is supported by the evidence presented at trial. And the jury's inference here that the components were positioned according to the requirements of Section 481.1031(b)(5) is supported by the evidence.

The jury heard three categories of testimony from Keinath: (1) that the statute, as amended in 2015, defines prohibited synthetic compounds based on their structure; (2) that the Chilly Willy that Appellant possessed contained fluoro-ADB; and (3) that fluoro-ADB is prohibited under the statute based on the specific components it possesses and how it is structured. Keinath informed the jury about the amended statute and about the listed components that make the synthetic compound illegal. He also informed the jury that fluoro-ADB contained indazole, carboxamide, and methoxy dimethyl oxobutane. Keinath went on to give his ultimate opinion that, "[b]ased off of those three combinations, that's why [fluoro-ADB] is able to be controlled under the structural class with how the law is currently written."

From the totality of Keinath's testimony, the jury was adequately informed of the fact that fluoro-ADB contains components that are prohibited by Section 481.1031(b)(5). Defense counsel's cross-examination also helped give context to the jury when he asked Keinath: "And that's what makes a compound, the place where the molecules are stuck, correct?" When Keinath answered that question with, "Correct," he was essentially telling the jury that what makes a synthetic compound, under the statute, is the molecular positioning of those components. Moreover, the jury heard Keinath's expert conclusion that fluoro-ADB does satisfy the criteria for a synthetic controlled substance as defined by Section 481.1031(b)(5).

From these premises, a rational jury could reasonably deduce that Keinath had examined the molecular structure of the fluoro-ADB, and had determined it to be a Penalty Group 2-A compound precisely because he found that the indazole (the core component) was substituted at the 1- position to any extent, and that it was substituted at the 3- position with carboxamide (the link component) attached to methoxy dimethyl oxobutane (the Group A component). The jury was informed by Keinath during both his direct and cross-examination about what the statute prohibits. He also testified to his ultimate conclusion that fluoro-ADB constitutes a Penalty Group 2-A synthetic controlled substance under Section 481.1031(b)(5). A rational jury could therefore draw the reasonable inference that the various components that he identified as falling within fluoro-ADB are positioned according to the dictates of Section 481.1031(b)(5). Under these circumstances, we agree with the court of appeals that the jury could have rationally concluded that Keinath found

the core components of fluoro-ADB to be positioned according to the requirements of the statute.

## CONCLUSION

We affirm the court of appeals' judgment that the evidence was legally sufficient because the State presented evidence from which the jury could rationally infer that fluoro-ADB was structured in such a way as to satisfy Section 481.103(b)(5).


DELIVERED:          March 31, 2021
PUBLISH